ROCKWELL INTERNATIONAL
CORPORATION

v.

The UNITED STATES

and

Harris Corporation,
intervening-defendant.

No. 585–83C.

United States Claims Court.

Sept. 29, 1983.

Gilbert J. Ginsburg, Washington, D.C., for plaintiff; Albert B. Krachman, Kenneth Bernard Weckstein and Epstein Becker Borsody & Green, P.C., Washington, D.C., of counsel.

Helene M. Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

John Lansdale, Jr., Washington, D.C., for intervening-defendant; James V. Dick, Squire, Sanders & Dempsey, W. Stanfield Johnson, George D. Ruttinger, Crowell & Moring, Washington, D.C., and Michael J. Boyle, Pittsburgh, Pa., of counsel.

## OPINION

MEROW, Judge:

This case comes before the court on plaintiff's application for a temporary restraining order and a preliminary injunction, and defendants' oppositions thereto. At issue in this matter is the validity of the decision by the Federal Emergency Management Agency (FEMA) that plaintiff's proposal, seeking the award of a negotiated cost-plus-incentive-fee contract by FEMA, was not within the competitive range. Having been so excluded from this procurement, plaintiff seeks injunctive relief to preclude the award of the contract by FEMA pending a determination of the validity of the competitive range decision. Following an initial hearing on September 21, 1983, it was determined to order expedited discovery and

to schedule an evidentiary hearing encompassing preliminary injunction matters. This hearing was held on September 26–27, at which time the testimony of five witnesses was received and 25 exhibits were received in evidence.

*Background*

Beginning in 1980, FEMA began development work on a program designed to meet governmental communication needs in emergency situations such as natural disaster or nuclear attack. A consulting firm, Computer Services Corporation, was retained to assist FEMA in drafting the required procurement specifications for this program and in evaluating the proposals to be obtained from prospective contractors. The specifications for this Direction, Control and Warning Communications System (DCWCS), as issued under FEMA Request for Proposals (RFP) No. EMW–R–1107, dated January 21, 1983, are most extensive and complex. The specifications are set forth in 12 substantial volumes of documents.

RFP No. EMW–R–1107 contemplated negotiated procurement in accordance with the Federal Procurement Regulations and FEMA Procurement Regulations. Proposals were requested in two parts. Part 1 was to contain the technical and management proposal. Part II was to contain cost and pricing data. The RFP set forth the criteria for evaluation of proposals by FEMA. Under the criteria, technical considerations were of prime importance to FEMA in that they were to be evaluated first and the point system to be utilized provided 550 points for technical, 250 points for management, 100 points for facilities and 100 points for schedule. The RFP contained the sentence, "Since the technical criterion is considered of greater importance, the Government reserves the right to award a contract to other than the low offeror."

FEMA was interested in obtaining an innovative, modern and proven communication system employing commercial "state-of-the-art" technology, and the specifications so informed the offerors.

Some 27 firms obtained RFP No. EMW–R–1107. In March of 1983 proposals were received from four firms. FEMA established a Source Evaluation Board (SEB) of eight members to determine, among other items, "which proposals are in the competitive range * * *." For the initial technical evaluation, in May of 1983 SEB members individually rated numerous specific sub-factors on a scale as follows: 5—superior; 4—excellent; 3—good; 2—fair; 1—marginal; 0—unacceptable. After completing their individual ratings, SEB members conferred and reached a "consensus" rating on the same scale for each sub-factor.

Following the initial evaluation, the chairman, SEB, furnished the contracting officer a report stating that "no proposal is complete or technically compliant to the specifications of the DCWCS." The report further noted that, on the order of merit, plaintiff was ranked second and that its proposal was "deemed technically unacceptable with the capability to be made acceptable should major modifications be made to specific subsections." It was recommended that plaintiff "be offered an opportunity for clarification * * *."

By a letter dated June 10, 1983 from the FEMA contracting officer to Rockwell International, Collins Communications Systems Division, plaintiff was notified that a preliminary evaluation of its technical proposal on RFP No. EMW–R–1107 had been completed and that "In order to complete the evaluation, written responses to the enclosed questions must be submitted to this office no later than 3:00 p.m., local time on 27 Jun 1983." The letter noted that "If, as a result of any question raised, you feel that parts of either your technical and/or cost proposal should be changed, you are to submit a revised proposal." Although FEMA's initial evaluation had produced concern over a limited number of specific items in plaintiff's proposal, and specific questions as to these items had been prepared for internal FEMA use, the 11 questions submitted to plaintiff with this June 10,

1983 letter were very general in nature. Testimony presented in this matter explained this practice as considered by FEMA to be necessary to avoid "technical leveling," *i.e.*, providing one offeror with information as to specific desired items or approaches to the detriment of another offeror who may have initially proposed such an item or an innovative and desirable approach.

Following the receipt of plaintiff's explanations, the SEB met on June 28–July 1, 1983 to evaluate the additional information provided. The same procedure of individual evaluation and then a consensus evaluation of the subfactors was followed. The SEB found plaintiff's proposal to be unacceptable due to the need for major modifications.

By a letter dated August 2, 1983 plaintiff was notified by FEMA as follows (in part):

We regret to inform you that your proposal has been determined to be outside the competitive range due to deficiencies which are considered to be of such magnitude as to require a restudy of your approach and to undertake a major rewrite of your proposal. Therefore, the proposal has been removed from further consideration. Additional information regarding this procurement is not available at this time, however, you will be notified as to the final selection.

As a result of this evaluation process by FEMA, only one offeror remained in the competitive range and FEMA then proceeded to negotiate with this remaining firm and is now prepared to award the DCWCS system contract to this firm.

The record evidence indicates that the DCWCS contract, with renewable options, can extend over a 9-year period and produce revenues of some $400 million. Estimates of required contractor expenditures under the contract in the first several months range from $10 million to $50 million. Plaintiff estimates that it has expended over $1 million in the preparation of the proposal which it submitted in this matter. There are presently available some $40 million in fiscal year 1983 appropriated funds to be obligated by any award of the contract prior to October 1, 1983.

*Discussion*

The issue before the court is the finality of FEMA's decision that plaintiff's RFP No. EMW–R–1107 proposal is outside the competitive range. The test for judicial review of such pre-award contract claim issues is whether the procurement officials had a rational or reasonable basis for this action. *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971); *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). The General Accounting Office applies the same standard in reviewing competitive range procurement decisions. *Alanthus Data Communications Corp.,* 83–1 CPD ¶ 147.

To qualify for injunctive relief, plaintiff must establish that FEMA's competitive range decision lacked a reasonable or rational basis. Additionally, the court must consider, notwithstanding the presence or absence of a rational or reasonable basis for the FEMA decision, whether there exists any overriding public interest which would warrant, in the exercise of sound judicial discretion, a refusal to grant injunctive relief. Also for consideration is whether plaintiff has demonstrated irreparable injury if injunctive relief is not granted and the possibility of any injury to others if injunctive relief is granted. *See N.V. Philips Gloeilampenfabrieken v. United States,* 1 Cl.Ct. 783 (1983); *Heli-Jet Corp. v. United States,* 2 Cl.Ct. 613 (1983).

FEMA's decision that plaintiff's proposal was not in the competitive range was based upon five items plaintiff included in its proposal: (1) a 20′ diameter antenna; (2) a 34′ van; (3) a single transponder capacity; (4) deletion of TEMPEST testing; and (5) Continental 217B low frequency (L/F) transmitter.

With respect to the antenna, plaintiff proposed to furnish a proven 18′ diameter antenna upgraded to the 20′ size specified. The antenna was to be a part of the SATCOM subsystem, a major and important portion of the DCWCS system. SATCOM

consisted of mobile ground stations designed to provide communications by use of a satellite. FEMA was concerned that an upgraded 18′ antenna might not withstand the environmental stresses, such as high winds, contemplated and preferred a 20′ antenna then commercially available only from another offeror.

In initially rating plaintiff's proposal for the 12 SATCOM sub-factors, the SEB consensus score was 11 "3's" (good) and one "2" (fair). No "unacceptable" (0) ratings were given. In the final SEB recommendation, the antenna proposed by plaintiff is, however, rated unacceptable and as a deficiency. No clarification questions were addressed to plaintiff concerning the antenna.

With respect to the 34′ van, the problem FEMA considered to exist was its size. For mobility reasons FEMA preferred smaller containers or shelters for the equipment and the specifications were so drafted. At a conference with offerors prior to proposal submissions, FEMA informed all offerors that smaller was better, but that vans would be acceptable. The specifications required that the SATCOM van provided be capable of being loaded into a C–130 transport plane within a limited period of time. Plaintiff proposed its 34′ van with the knowledge that it had, with the aid of a mechanical loader, been loaded into C–130 aircraft on other projects within the time frame specified in the instant procurement. The SEB's initial consensus rating for the appropriate SATCOM sub-factor covering this item was a "2" (fair). The final SEB recommendation classified plaintiff's van item as a deviation, not a deficiency, and recommended that it was "PA" (possibly acceptable).

With respect to the single transponder capacity, FEMA contemplated adding an anti-jamming capability to the SATCOM subsystem in the future, so noted this in the specifications, and for this reason contemplated that the offerors would provide the additional transponder capability this further addition would require. The specifications, however, used the term "A transponder" and provided that as an option the offeror could propose "a single up converter and a single down converter" which equated to one transponder capability. As noted above, no SATCOM sub-factor was rated unacceptable in the initial SEB evaluation. In the final SEB evaluation the single up and down converters were classified as an "option," not a deficiency, and the recommendation was "U" (unacceptable).

The SEB action with respect to the proposal of TEMPEST testing deletion was similar to the transponder action described above. The specifications provided for a number of tests, including TEMPEST, involving the requirement that the communication equipment be shielded from outside and inside interference and potential interception of data before it could be encoded. Because it considered other tests to be equivalent, to save time and money plaintiff proposed deletion of the TEMPEST test. As noted above, the initial SEB evaluation did not rate any SATCOM sub-factors as unacceptable. The final SEB evaluation classified deletion of TEMPEST testing as an option, not a deficiency, and proposed it as "U" (unacceptable).

With respect to the low frequency subsystem of the DCWCS system, plaintiff proposed a Continental 217B transmitter which operated by means of vacuum tubes. This item was proposed because the FEMA specifications contained a drawing showing the "Conceptual Transmit Shelter Layout" which, in effect, copied a Continental 217B floor plan view drawing with the only change being a conversion of the dimensions set forth in inches on the Continental drawing to meters on the FEMA drawing. In addition, the FEMA specifications noted a "high voltage power supply" which would be typical for a vacuum tube transmitter. The SEB in its initial evaluation of the low frequency (L/F) subsystem rated 12 subfactors—11 "3's" (good) and one "2" (fair). A FEMA analysis, prepared for SEB use, classified the L/F transmitter proposed by plaintiff as a "deviation," not a deficiency, noting that it was not state-of-the-art equipment. FEMA preferred a smaller solid state transmitter and the analysis sets

forth concerns over the ability of plaintiff's larger tube-type equipment to withstand the mobile operation contemplated. Because the L/F subsystem was considered to have a high chance of surviving nuclear attack and was part of the system providing attack warning to the public, FEMA considered the L/F transmitter matter to be a major issue. The final SEB L/F transmitter evaluation lists the item under "Deviations" with a recommendation of "U" (unacceptable) and the additional notation of "Deficiency."

With minor revisions in plaintiff's proposal (with the possible exception of the antenna), FEMA's major concerns with respect to plaintiff's proposals could be satisfied. Adding transponder capability was a minor revision requiring only several days work. Changing from a 34′ van to two 20′ vans also required limited revision work. Retaining TEMPEST testing called for a routine and minor revision of the proposal. The only 20′ antenna on the market at the time was a proprietary item to be obtained from a competitor for this contract and, as such, was probably not available to plaintiff.

FEMA Regulation 44 C.F.R. § 3.802–2(c) provides, with respect to source selection procedures that "The competitive range shall include those proposals which through written or oral discussions with the offeror, have a reasonable change [sic] of selection when all factors are considered, including cost."

FEMA's internal evaluation plan for this project instructed that "A proposal shall be considered unacceptable if the SEB determines that it could not be made acceptable through minor written revisions and/or oral discussions."

In evaluating the validity of competitive range determinations under the rational or reasonable basis standard, the General Accounting Office (GAO) has, while not substituting its judgment for that of the agency, promoted the legislative and regulatory policy favoring competition by giving close scrutiny to such decisions where only one firm remains for negotiations. *Spectrum Leasing Corp.,* 82–1 CPD ¶ 383; *Coherent Laser Systems, Inc.,* 82–1 CPD ¶ 517.

Similarly, as only one firm remains for negotiations in the instant procurement, in applying a rational or reasonable standard in this proceeding, close scrutiny, to the extent feasible in the time available, has been given to FEMA's decision to exclude plaintiff's proposal. Upon such scrutiny and given the above regulatory provision restricting the circumstances where an offeror can be preliminarily excluded from the competitive range, it is concluded that the FEMA decision lacks a rational or reasoned basis. To have a reasoned or rational basis, there must be a rational connection between the facts established and the choice made. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). The facts established here show that FEMA, itself, did not consider all the five items on which it based its decision to be "deficiencies" as stated in its August 2, 1983 letter to plaintiff. Moreover, curative measures to satisfy FEMA's concerns with respect to these five items would not require a restudy of plaintiff's approach and a "major rewrite" of plaintiff's proposal as also stated in FEMA's August 2, 1983 letter.

Instead, as noted above, the evidence of record demonstrates plaintiff's proposal concerning the five items in question could be made acceptable with relatively minor revisions.[1] As such, absent a rational connection between the underlying facts and the decision reached by FEMA, it must be concluded that excluding plaintiff from the competitive range was not a rational decision on FEMA's part.

Given this conclusion, it must now be determined whether injunctive relief can be granted in the circumstances of this case so

---

1. In this regard it is noted that the expert consulting firm retained by FEMA to assist in evaluating the proposals recommended that plaintiff's proposal be included in the competitive range.

**6**

as to permit negotiations to proceed with plaintiff as well as with the firm previously placed in the competitive range.

As noted above, some $40 million of 1983 fiscal year funds are available for this contract. These funds will become unavailable for this procurement and lapse if a binding contract is not awarded prior to midnight on September 30, 1983. 31 U.S.C. §§ 1341, 1501. The evidence presented in this proceeding cogently demonstrated that the communications systems involved are urgently required, without further delay, in the interests of national defense and national security. Negotiations to include plaintiff could not be completed prior to sometime late in October 1983, at the earliest, at which time the 1983 appropriated funds would have lapsed such that a major delay would result in the schedule for the contract.[2]

In this exceptional circumstance, in the sound discretion of the court, injunctive relief must be denied and plaintiff must be relegated to a claim for damages. Section 133(a), Pub.L. No. 97–164, 96 Stat. 25, 38; *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1302 (D.C.Cir.1971); *Serv-Air, Inc. v. Seamans*, 473 F.2d 158, 160 (D.C.Cir.1972); *Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613 (1983); *Onan Corp. v. United States*, 476 F.Supp. 428 (D.Minn.1979).

*Conclusion*

For the reasons stated above, it is concluded that the injunctive relief sought by plaintiff must be denied and it is ORDERED:

(1) Plaintiff's application for a temporary restraining order and a preliminary injunction is denied;

(2) Plaintiff shall have 30 days to amend its complaint to seek any other and different relief, if any, deemed to be appropriate in the circumstances of this matter.

2. Plaintiff has proposed several innovative ways in which a lapse of appropriated funds might be forestalled such as an award of the contract prior to October 1, 1983 to both plaintiff and the other remaining offeror, with a condition that one will be terminated upon conclusion of the negotiations. Such step, absent

required prior negotiations, might well not result in a binding contract. *Schoenbrod v. United States*, 187 Ct.Cl. 627, 410 F.2d 400 (1969). Moreover, the problem is caused by legislation requiring one-year obligation of funds, and the solution, if a solution is desired, is deemed to be with Congress, not this court.